Allison Lamont NORMAN, Defendant
Below–Appellant,

v.

STATE of Delaware, Plaintiff
Below–Appellee.

Nos. 531,2007, 565,2007.

Supreme Court of Delaware.

Submitted: March 9, 2009.
Decided: June 16, 2009.

844

846

Bernard J. O'Donnell, Esquire (argued), Nicole M. Walker, Esquire (argued), and Santino Ceccotti, Esquire, of the Office of the Public Defender, Wilmington, Delaware, for appellant.

Abby L. Adams, Esquire, Paul R. Wallace, Esquire (argued), and John R. Williams, Esquire of the Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice.

Before us are Defendant–Appellant Allison Lamont Norman's consolidated direct and automatic appeals[1] from his Superior Court conviction of murder in the first degree and related offenses, which resulted in a sentence of death and 145 years in prison.[2] Norman raises four arguments. First, he claims that the court improperly allowed the expert psychiatric testimony of Dr. Stephen Mechanick to be considered in the guilt and penalty phases of the trial. Second, he contends that a death sentence cannot be based on the single statutory aggravating circumstance that his conduct resulted in the death of two or more persons,[3] where one of the deaths occurred outside of Delaware and beyond its jurisdiction. Third, he argues that even if an out-of-state death can be used to establish an aggravating circumstance, his lack of criminal responsibility for that death under the law of that state must be considered as a mitigating circumstance. Fourth, he urges that executing a person who lacked substantial capacity to appreciate the criminality of his conduct violates the Eighth Amendment of the United States Constitution and Article I, Section 11 of the Delaware Constitution.

In this Opinion, we affirm the judgments of conviction by the Superior Court. We conclude that Dr. Mechanick's initial interview of Norman in Maryland on behalf of Delaware prosecutors violated Norman's Sixth Amendment right to counsel on the Delaware charges, but that Dr. Mechanick's testimony was nonetheless admissible under the independent source and inevitable discovery exceptions to the exclusionary rule. We also conclude that the State may use evidence of criminal conduct in another state to establish the existence of a statutory aggravating circumstance under the Delaware statute.

However, we find merit to Norman's third argument and, therefore, remand for a new penalty hearing. The sentencer in a capital case must consider, in mitigation, any aspect of a defendant's character or record and any mitigating circumstance that the defendant proffers as a basis for a sentence less than death. Lack of criminal responsibility under the law of the state where an act occurs is a mitigating circumstance. By relying upon the aggravating circumstance that Norman caused the death of two persons, the prosecution put in issue a second homicide in Maryland. Norman presented evidence in mitigation of his lack of criminal responsibility for his conduct in Maryland. Neither the jury nor the trial judge decided Norman's claim in mitigation under Maryland law. This

1. Pursuant to 11 *Del. C.* § 4209(g), this Court automatically reviews the Superior Court's recommendation and imposition of the death penalty to ensure it is supported by proof of a statutory aggravator beyond a reasonable doubt, is not arbitrary and capricious, and is proportionate to the penalty in similar capital cases. This automatic appeal does not affect the defendant's right to raise any error in the guilt phase of the trial. 11 *Del. C.* § 4209(h).

2. Norman was convicted of ten separate charges: one count of murder in the first degree, two counts of attempted murder in the first degree; one count of felony theft, three counts of possession of a firearm during the commission of a felony; and three counts of wearing body armor during the commission of a felony.

3. *See* 11 *Del. C.* § 4209(e)(1)k.

was because the Superior Court determined—at the State's request—that Norman's conduct in Maryland would be "screened" under Delaware law, notwithstanding evidence of his lack of any criminal responsibility under Maryland law. This ruling—and the absence of any instruction to guide the jury on the issue of Norman's alleged lack of criminal responsibility under Maryland law—requires a new penalty hearing. Without guidance from the trial judge on Maryland law, the jury could not properly determine the existence of the alleged mitigating circumstance that Norman was "not criminally responsible" for the crimes he committed in Maryland or weigh that circumstance in its determination of sentence. Delaware law and the Eighth Amendment to the United States Constitution *require* the jury and the judge to consider *any* mitigating circumstance that may be raised by the evidence.[4] The absence of an instruction on how to determine the existence of the alleged mitigating circumstance jeopardized the fairness and integrity of the penalty hearing in this case. Accordingly, we must reverse the death sentence imposed and remand for a new penalty hearing that will include an instruction to the jury on the applicable Maryland law.[5]

## I. Facts and Procedural History.

In a tragic shooting spree that unfolded across fifteen miles and two states on April 7, 2005, Norman shot at numerous people while delirious, killing two and wounding several others, including one woman who became paralyzed. Norman fatally wounded Jamell Weston and wounded Marcus Cannon near a school bus stop at the entrance to the Carvel Gardens apartment complex in Laurel, Delaware. Afterward, Norman stole a parked car from the apartment complex and drove to Salisbury, Maryland. Along the way, Anthony White attempted to ask Norman for a ride home, but as White approached the vehicle, Norman shot and wounded him. When Norman reached Delmar, Maryland, he shot at a garbage truck and crew, but none of the workers sustained injuries. While continuing to drive to Salisbury, Norman shot at several people and vehicles, wounding Marsha Hankerson. When he arrived at his friend Tobias Cannon's home in Salisbury, Norman took one of his dogs and shot two others. He then shot and killed Davondale Peters after Peters gave him a ride. Norman also shot Carla Green, who was driving with her daughter, leaving Green paralyzed. After shooting Peters and Green, Norman chased after witnesses and went from house to house in Salisbury, eventually breaking into the home of Mary and Watson Dutton, an elderly couple. He left their home without harming them and was arrested a short time later by Wicomico County Sheriff's officers.

---

4. *See* 11 *Del. C.* § 4209(c)(4) ("In the instructions to the jury the Court shall include instructions for [the jury] to consider any mitigating circumstances ... which may be raised by the evidence."); *see also Lockett v. Ohio*, 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."); *cf. Eddings v. Oklahoma*, 455 U.S. 104, 110–12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (*Lockett* adopted by majority of the Court); *State v. White*, 395 A.2d 1082, 1088 (Del.1978) (finding Section 4029 satisfies the constitutional standards laid down in *Lockett* and its progeny).

5. As a result, issues pertaining to our proportionality review and Norman's claim that executing a person who lacked substantial capacity to appreciate the criminality of his conduct violates the United States and Delaware constitutions are not yet ripe for review.

The defense presented evidence that Norman was acting in the throes of a psychotic episode driven by bizarre delusions that were the culmination of a lifetime of exposure to abuse, violence, and criminal conduct. As related by psychiatrists at trial, Norman experienced a concurrence of factors which contributed to this mental state. On April 17, 2003, his older brother, Shane DeShields, and a friend killed a man in a botched attempt to steal the drugs the man was selling. Norman, who deeply admired DeShields, was crushed by his brother's imprisonment. He attended DeShields's capital murder trial and witnessed his conviction. At his brother's penalty hearing, evidence was presented that DeShields and Norman, when young children, were sexually assaulted by a babysitter, Ben Green. Norman, as a child, had begged his mother not to leave them with Green. He was furious at her for having kept the abuse quiet and for denying him the support of family and friends. His anger toward his mother was renewed by the cavalier attitude he felt she displayed about the assaults at the hearing. On October 8, 2004, DeShields was sentenced to life in prison.[6]

On October 16, 2004, Norman was parked at a convenience store in Delmar, Maryland when two men approached his vehicle and opened fire. Norman returned fire, but was shot in the abdomen and leg. His wounds required surgery to his colon and he was hospitalized for several weeks. Norman was charged with a weapons offense in connection with the shooting and faced a potential ten year prison sentence in Maryland upon his release from the hospital.

After his discharge from the hospital, Norman moved in with his mother in Seaford. Although still in pain from the sur-gery, he stopped taking his prescribed medications; instead, he consumed marijuana and ecstasy. For the next few months, Norman took two to four ecstasy tablets per day and regularly smoked marijuana. He was terrified that his life was in danger because he did not know the identity of at least one of the men who shot him, and he suspected that his own friends were involved.

In January 2005, Norman moved to Carvel Gardens in Laurel to live with his girlfriend, Kisha DeShields, and her five children. He was the father of one of Kisha's children, five-year-old Donesha. On January 10, Ronshelle Harmon gave birth to Norman's son, Ny'Kael. Norman did not sign the birth certificate, but he visited Harmon in the hospital and occasionally visited Ny'Kael in early Spring 2005, sometimes bringing Donesha along.

On April 6, knowing he faced up to ten years in jail on the weapons charge, Norman failed to appear for his scheduled Maryland court appearance. A warrant was issued for his arrest. Norman spent a few hours with his friend Devon Cannon, during which time they smoked marijuana. He also took ecstasy. He then discussed potentially killing his mother, even scouting a gravesite in the wooded area to which he and Devon had traveled. Norman then began to fear Devon might kill him, and told him so, but later apologized.

Later that night, Norman started to believe he had special powers of vision. He thought he could see things in the dark and that things turned white for him in the darkness. He believed he was blessed with this special gift. When Kisha seemed to ignore or neglect him, Norman became angry, pointed a gun at her, and told her not to "disrespect" him. He then danced

6. *See State v. DeShields,* Del.Super., No. 0304012359A (Oct. 8, 2004), *aff'd,* 879 A.2d 591 (Del.2005).

around the apartment, announcing that he was the Messiah who ruled the world.

After Norman calmed down, he watched an episode of the television show, *The X-Files*. He formed the belief that aliens or demons were trying to get into the children's bedrooms to kidnap and rape them. Norman went into their rooms and, thinking his enhanced vision allowed him to see the creatures outside in the darkness, he yelled at them and chased them. Thinking that this was a test to see if he could protect his family, Norman "guarded" the children that night by pinching and pulling the little girls' hair in the belief that their screams would cause the aliens or demons to retreat.

By the next morning, Norman appeared to Kisha to be better, though he still expressed concern for the children's safety. Norman later explained that, based on recent experiences, he also had formed the belief that black people had been taken over by the demonic forces he was fighting. According to Norman, even though some of the people he shot at were white, he believed them to be black, and therefore evil, when he shot at them.

Norman's delusions continued. After helping Kisha get the children ready for school, Norman donned a bulletproof vest and, armed with a gun, took Donesha to the bus stop at about 8 a.m. On their way, they encountered Jamell Weston and Marcus Cannon, who were returning from dropping off Weston's nephew and Cannon's girlfriend's children. Believing that Weston and Cannon were alien or demon creatures who were about to kidnap and molest Donesha, Norman drew his gun and shot Weston at point blank range, once in the face and once in the chest. Weston fell to the sidewalk and died. Cannon fled and Norman fired after him, hitting him in the arm. Norman then walked back to the apartment, with Done-sha running ahead to tell her mother what had occurred.

Apparently misunderstanding Donesha's account, Kisha thought Norman had only fired his gun into the air. She told him to leave because the police would probably be called. Norman left, taking his keys, cell phone, holster, $1,681 in cash, the 9mm pistol he had used to kill Weston and shoot Cannon, and three magazines of ammunition. He was still wearing a bulletproof vest. Continuing to believe that his battle against the "bad people" was ongoing, Norman proceeded south on Route 13 to Salisbury, Maryland, shooting at several people and vehicles along the way. In his shooting spree he narrowly missed numerous innocent bystanders, but did seriously injure Anthony White and Marsha Hankerson.

After Norman arrived in Salisbury, he went to the home of Tobias Cannon. He took a pit bull that belonged to Cannon, but shot his two other dogs, believing that they were demons. When the dog ran into the street, an SUV stopped to avoid hitting it. Norman took this as a sign that the driver of the SUV had come to aid him in his war against the demons. He asked the driver, Davondale Peters, for a ride and got in the vehicle with the dog. When Peters failed to follow all of Norman's rambling directions and started to drive slowly, Norman became suspicious. Thinking Peters also was associated with the demons he believed he was fighting, Norman jumped out of the SUV and ran around to the driver's side. He said: "No, you hold up motherfucker"; and then fired his gun several times into the SUV. Peters was mortally wounded, but was able to drive away. He drove over a curb, a mailbox, and through a fence, with the vehicle coming to rest against a house. Peters died at the scene.

After shooting Peters, Norman approached a white van that had stopped at the same intersection. Carla Green was driving the van with her daughter in the car seat behind her. Norman threw open the door and said: "This is a carjacking, bitch." Fearing for her daughter, Green slammed the door shut and stomped on the accelerator. As she drove away, Norman shot at her several times, barely missing the child safety seat, but hitting Green three times and rendering her a paraplegic. Norman then turned on Natalie Reddick, who had witnessed both of the prior shootings. Norman chased after her, but had run out of ammunition. Reddick retreated to her mother's house and refused to let Norman in. Norman then proceeded from house to house, banging on doors. As he did so, he spotted Sabrina Gilmore and her grandniece, who were also able to reach the safety of Gilmore's parents' house before Norman could descend upon them.

Norman then broke into the home of an elderly couple, Mary and Watson Dutton. He told them that someone was after him, and he needed a car to escape. Mr. Dutton refused to give Norman a car. Norman then demanded money from Mrs. Dutton, who was crying. Norman pushed her to the floor with both hands. He then threw some glass items from the table and shelves, but after Mr. Dutton hit him with a broom, Norman left.

Deputies from the Wicomico County Sheriff's Office arrived on the scene. Norman saw the officers and hid behind parked cars. Reddick came out of her mother's house, shouted to the officers, and pointed at Norman. When the deputies shouted: "Police! Stop!," Norman fled. Norman was captured after a short chase. When he was taken into custody, the officers noted that Norman was wearing body armor and had in his possession a 9mm handgun, a holster, three magazines, $1,681 in cash, a cell phone, and keys.

After Norman was placed in a police vehicle, he shouted out of the window of the vehicle, yelled for help, and claimed he was the Messiah. Several days after Norman's arrest, he was transferred from the Wicomico County Detention Center to the Clifton T. Perkins Hospital ("Perkins") in Jessup, Maryland due to concern that Norman was a danger to himself or others.[7] He was kept at Perkins, where he was restrained and treated by psychiatrists with anti-psychotic medications. On May 17, 2005, Norman was indicted in Maryland for murder and related offenses. On June 27, 2005, Norman was also indicted in Delaware for murder in the first degree and related offenses.

The Maryland Public Defender's Office represented Norman on the Maryland charges. It hired Joanna Brandt, M.D., a psychiatrist specializing in forensic psychiatry, to perform a psychological evaluation of Norman. Dr. Brandt concluded that Norman suffered from a Psychotic Disorder, NOS (not otherwise specified) at the time of the offenses, and therefore, lacked substantial capacity to appreciate the criminality of his offenses on April 7, 2005.[8]

---

7. Norman's unusual behavior continued even after he was placed in a jail cell. Additionally, several days later, Norman attempted to put his head into the toilet, threw feces, wrapped his head in sheets, and held his breath, asking the prison staff to let him die.

8. *See generally* JOANNA D. BRANDT, PSYCHIATRIC EVALUATION (Dec. 7, 2006) [hereinafter BRANDT REPORT]. Dr. Brandt testified that Norman

"was grossly, floridly psychotic on April 7th, 2005" and, while Norman "had used drugs prior to the time of the offense, that by 8:00 in the morning, he was no longer intoxicated with drugs." She also explained that "as time went on and it became four months, five months, it was clear that the drugs were no longer affecting him, and the appropriate diagnosis was psychotic disorder NOS, or a primary psychotic illness."

852

The Maryland Circuit Court ordered that a second evaluation of Norman be performed by Saadia Alizai–Cowan, M.D., the Director of the Forensic Psychiatry Fellowship Program at Perkins. Dr. Alizai–Cowan also concluded that "to a reasonable degree of medical certainty, at the time of the offense, due to his Psychotic Disorder, NOS, Norman lacked substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law."[9] The opinions of these two experts supported a "not criminally responsible" defense under Maryland law.[10]

In December 2005, after receiving Dr. Alizai–Cowan's report, the State's Attorney for Wicomico County, Maryland contacted a Deputy Attorney General in Sussex County, Delaware to discuss having a third psychiatric examination of Norman for the Maryland case. Together, the Maryland and Delaware prosecutors decided to retain Stephen Mechanick, M.D., a forensic psychiatrist, with each state paying one-half of his fee. The Delaware Attorney General's office initiated contact with Dr. Mechanick and, along with the Maryland prosecutors, retained him to evaluate Norman under both Maryland and Delaware law.

The Maryland prosecutors applied to the Maryland Circuit Court for an order permitting Dr. Mechanick to examine Norman, which was granted. Dr. Mechanick evaluated Norman on January 28, 2006 and issued lengthy reports on March 17. He wrote two psychiatric evaluations, one for Maryland authorities and one for Delaware authorities. The first sixty-two pages and the psychiatric diagnoses of the two reports were identical. In the last two pages of each report Dr. Mechanick tailored his opinion to the differing criminal responsibility laws in Maryland and Delaware. He concluded that Norman did not appreciate the criminality of his conduct and was not able to conform his conduct to the requirements of the law, but opined that Norman's actions were the result of intoxication and substance-induced delirium. As a result, Dr. Mechanick concluded that Norman did not meet Delaware's more narrow standard for "not guilty by reason of insanity" ("NGRI") or "guilty but mentally ill" ("GBMI"), because his mental state was caused by voluntary intoxication.[11]

The Maryland prosecutors dismissed all of the charges against Norman in Maryland, including the murder of Peters, on April 6, 2006. That was done with knowl-

9. *See generally* Saadia Alizai–Cowan, Pretrial Evaluation (Dec. 8, 2005) [hereinafter Alizai–Cowan Report]. In ruling out a substance-induced psychosis, Dr. Alizai–Cowan explained at trial that Norman's "symptoms lasted well over 30 days[,]" and "[w]hatever might have been the drug causing this effect, when you stop this, the symptoms should resolve. His symptoms went on for months, not just a night or a week."

10. Md.Code Ann.Crim. Proc. § 3–109. The statute provides that "A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to: (1) appreciate the criminality of that conduct; or

(2) conform that conduct to the requirements of law."

11. *See* Stephen Mechanick, Psychiatric Evaluation of Allison Lamont Norman (Mar. 17, 2006) [hereinafter Mechanick First Report] ("It is my opinion that Mr. Norman lacked substantial capacity to appreciate the wrongfulness of his conduct related to his criminal charges that occurred in Delaware. It is also my opinion that Mr. Norman's intoxication(s) and delirium substantially disturbed his thinking, feeling, and behavior. However, to the extent that this was due to voluntary intoxication (e.g., with marijuana) Mr. Norman would not meet Delaware's definition of Not Guilty by Reason of Insanity or Guilty But Mentally Ill.")

edge of the opinion of Dr. Alizai–Cowan that Norman met the standard for "not criminally responsible" under Maryland law. In his *Findings after Penalty Hearing*, the Delaware trial judge recognized that the Maryland charges were most likely dropped because of Norman's mental condition. The court noted: "The laws governing accountability and culpability for one's conduct while voluntarily intoxicated and the interaction between intoxication and mental illness differ between Maryland and Delaware. Apparently, for that reason, the Wicomico County State's Attorney dismissed the Maryland charges and Norman was returned to Delaware in April 2006." [12] After Norman's extradition to Delaware, the Public Defender was appointed to represent him.

Prior to his trial in Delaware, Norman's Delaware defense counsel filed a notice of an insanity defense pursuant to Superior Court Criminal Rule 12.2. They also moved to preclude the State's use of Dr. Mechanick's expert testimony, arguing that the State had deliberately violated Norman's Sixth Amendment right to counsel when it obtained the psychiatric evaluation in Maryland. The Superior Court found there was a Sixth Amendment violation, but concluded that it was harmless error. Additionally, the court imposed a restriction that Dr. Mechanick could "only be used as a rebuttal witness assuming the Defendant pursues the defense of not guilty by reason of insanity." [13]

The State then moved for a second psychiatric examination of Norman by Dr. Mechanick. The motion was granted and, on March 5, 2007, Dr. Mechanick reevaluated Norman in the Special Housing Unit of the Delaware Correctional Center to address information elicited by Dr. Brandt regarding prior instances of psychotic episodes. [14] Norman denied experiencing any psychotic symptoms prior to using ecstasy in late February and early March 2005, claimed he had no odd thoughts or experiences since August 2005, and corroborated his prior statements on drug use. Dr. Mechanick's conclusion remained unchanged.

The State notified the court and defense counsel that it would seek the death penalty against Norman based on one statutory aggravator—that Norman caused the death of two or more persons: Weston in Delaware and Peters in Maryland. [15] Prior to trial, Norman filed a motion to preclude the State from using an out-of-state death as an aggravating factor, arguing, in part, that Norman was not criminally responsible for the death of Peters under Maryland law. Following a hearing on the defense motion, the State filed a motion requesting that "all references, conclusions and opinions as to the standard of insanity in Maryland should be excluded." In support of its motion, the State asserted the following:

1. On or about December 8, 2005, Dr. Alizai–Cowan, M.D. completed a re-

---

12. *State v. Norman*, 2007 WL 3105759, at *2 (Del.Super.Ct. Sept. 28, 2007) [hereinafter *Findings After Penalty Hearing*].

13. *State v. Norman*, Del.Super., No. 0504005647, at 10 (Feb. 1, 2007) (Letter to counsel denying defense motion to preclude use of Dr. Mechanick's testimony or evaluation for any purpose) [hereinafter *Order re: Expert Testimony*].

14. *See* STEPHEN MECHANICK, PSYCHIATRIC REEVALUATION OF ALLISON LAMONT NORMAN (Mar. 14,

2007) [hereinafter MECHANICK SECOND REPORT]. Dr. Brandt's evaluation was issued nine months after Dr. Mechanick's first report. In one interview, Norman told Dr. Brandt that he had experienced hallucinations or "signs" as early as 15. As Norman's prior medical history was important to Dr. Mechanick's diagnosis, the re-evaluation was meant to clarify the inconsistency.

15. 11 *Del. C.* § 4209(e)(1)k.

port in which he generated an opinion of Alison [sic] Lamont Norman's mental state at the time of the Maryland offenses under Maryland's insanity law.

2. On or about July 6, 2005, Dr. Joanna D. Brandt, M.D. completed a report in which she generated an opinion of Alison [sic] Lamont Norman's mental state at the time of the Maryland offenses under Maryland's insanity law.

3. In the case *sub judice*, the issues surrounding mental state and [sic] will be controlled by Delaware's insanity law.

4. Pursuant to Delaware Criminal Rule of Evidence 402 & 403 opinions, references and qualifications under Maryland's laws are not relevant and should therefore be inadmissible.

The court denied the defense motion to preclude and, in the same order, addressed the issues raised in the State's motion in limine, stating that:

If the Defendant is found guilty and the State seeks the death penalty, then the jury may consider all of the events which occurred that day including the acts occurring in Maryland. Issues of

the Defendant's legal competency for his actions in Maryland will need to be addressed but these decisions will be filtered through the Delaware standards. The State of Delaware shall not be bound by Maryland's determination of criminal responsibility. Mr. Norman's conduct will be judged by law of Delaware as to his criminal responsibility.[16]

At trial, Norman did not testify. Defense counsel acknowledged in opening statements that Norman had committed the acts and conceded in closing argument that the State had proven the facts of the crimes beyond a reasonable doubt. Defense counsel sought a verdict of NGRI and offered the testimony of Dr. Brandt and Dr. Alizai–Cowan.[17] After the defense raised the insanity defense, the State presented Dr. Mechanick's evaluation and testimony in rebuttal. The jury rejected the verdicts of NGRI and GBMI and found Norman guilty as charged. It did so after the prosecution argued, and the trial court instructed, that, under Delaware law, a defendant may not rely upon the defense of NGRI, nor may a jury return a verdict of GBMI, if a mental illness or psychiatric disorder was proximately caused by the use of alcohol or illegal drugs.[18]

---

**16.** *State v. Norman*, Del.Super., No. 0504005647, at 2 (Dec. 28, 2006) (Letter to counsel denying defense motion to preclude State from using second death in Maryland as aggravator) [hereinafter *Order re: Out-of-State Death* ].

**17.** The court also instructed the jury on the verdict of "guilty but mentally ill."

**18.** The court instructed the jury:

The fact, if it is a fact, that the criminal acts were committed while the defendant was in a state of intoxication, or was committed because of such intoxication, is no defense to any criminal charge if the intoxication was voluntary.

Intoxication means the inability, resulting from the introduction of substances into the

body, to exercise control over one's mental faculties.

Voluntary intoxication means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication he knows or should have known, unless he introduces them pursuant to medical advice or under such duress as would afford a defense to a prosecution for a criminal offense.

\* \* \*

[The court then instructed the jury on mental illness and the verdicts of not guilty by reason of insanity and guilty but mentally ill.]

\* \* \*

Another statute that is pertinent, 11 Delaware Code 401(c), states as follows: It shall

At the close of the guilt phase, counsel and the court again discussed whether Norman's criminal responsibility for Peters's death should be determined under Maryland law. The court reserved judgment until the start of the penalty phase, at which time it reiterated its earlier ruling that "[i]t is the State's obligation to prove its aggravating factor beyond a reasonable doubt with the applicable law of Delaware. Therefore, it will be screened through the applicable Delaware law." The State then introduced evidence that Norman caused the death of Davondale Peters in Maryland. In addition, the State offered evidence that Norman engaged in other uncharged criminal conduct in Maryland in order to prove a non-statutory aggravating circumstance. In response, the defense presented mitigation evidence, including a stipulation on the psychiatrists' differing opinions about Norman's lack of criminal responsibility under the law of Maryland (the "Stipulation").[19] Consistent with his

not be a defense under this section if the alleged insanity or mental illness was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof, unless such substance was prescribed for the defendant by a licensed health care practitioner and was used in accordance with the directions of the prescription.

There is another Delaware law, Title 11, Section 422, which states as follows: Evidence of voluntary intoxication shall not be admissible for the purpose of proving the existence of mental illness, mental defect or psychiatric disorder as those terms have been defined in 401 of this title.

Several of these terms are defined by the Code. I have already defined intoxication for you. That means the inability, resulting from the introduction of substances into the body, to exercise control over one's mental faculties.

Voluntary intoxication has previously been defined. It means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication the actor knows or should know unless the actor introduces them pursuant to medical advice. You should also be aware that addiction to an intoxicating substance does not make the consumption of that substance involuntary.

With the above in mind, I shall paraphrase 11 Delaware Code 401(c):

A defendant may not rely upon the defense of not guilty by reason of insanity, and the jury may not return a verdict of guilty, but mentally ill, if the alleged insanity, mental illness or psychiatric disorder was proximately caused by the use of alcohol or any non-prescribed or illegal drugs.

19. The Stipulation provides, in its entirety:

The parties stipulate as follows:

Dr. Mechanick's opinion is as follows:

Mr. Norman's lack of appreciation of the criminality of his actions due to voluntary intoxication (i.e. with marijuana), would not meet the criteria for not criminally responsible in Maryland.

The delirium that Mr. Norman experienced at the time of the charges was caused by his substance abuse. If the delirium is considered the product of a voluntary intoxication, then Mr. Norman's behavior at the time of the conduct charged would not meet the definition of not criminally responsible in Maryland.

The Maryland Legal Code states the following:

Where temporary insanity results from present consumption of intoxicants and persists only so long as the individual is under the direct influence of the intoxicant, such insanity is not a defense, but where the temporary insanity is a settled condition of insanity, whether or not permanent, which, although created by the voluntary use of intoxicants, persists even after the direct influence of an intoxicant has ceased, even after the chemical agent is no longer present in the individual's bloodstream, and which is the result of continued or persistent use, rather than ingestion on a particular occasion, such temporary insanity is a valid defense to a criminal act.

It is a matter for the court to determine whether Mr. Norman's delirium at the time of the current charges is allowed under this definition as an insanity defense. It is clear that Mr. Norman had substances in his bloodstream at the time of the conduct charged. Blood and urine samples later that day showed evidence of marijuana, Ecstasy, and cocaine, albeit at relatively low levels. Mr. Norman's delirium continued

prior ruling that the evidence would be "screened through the applicable Delaware law," the trial judge provided no instruction to the jury on how to determine under Maryland law whether Norman lacked criminal responsibility for his conduct in that state.

The jury found unanimously that the State had established the statutory aggravating circumstance that Norman's course of conduct resulted in the death of at least two persons whose death was the probable consequence of Norman's actions. The jury also found unanimously that the aggravating circumstances outweighed the mitigating circumstances and recommended a sentence of death.[20]

After weighing the evidence, the trial judge concurred that the State had established the statutory aggravating circumstance beyond a reasonable doubt. He also found the existence of twelve non-statutory aggravating circumstances and thirty-two mitigating circumstances.[21] Af-

---

into his hospitalization at the Perkins Hospital, where his toxin screen showed no evidence of substances.

The Maryland Legal Code also states the following:

If an accused is insane whether or not he is directly under influence of intoxicant, even though that insanity was caused by voluntary drinking, such insanity may excuse responsibility for a criminal act.

The use of the word "may" in this sentence does not provide guidance about whether Mr. Norman's psychiatric condition at the time of the conduct charge, while under the influence of substances, meets the Maryland standard for not criminally responsible.

In addition, the parties stipulate as follows:

In Dr. Alizai–Cowan's opinion, Mr. Norman did meet the standard for not criminally responsible under Maryland law.

**20.** *Findings After Penalty Hearing, supra* note 12, at *2.

**21.** *See id.* at *9–16. The non-statutory aggravating circumstances were: (1) the other conduct for which Norman was found guilty in Counts 2 through 10; (2) evidence of other uncharged misconduct that occurred in Maryland and Delaware on April 7, 2005; (3) victim impact as to Jamell Weston; (4) Norman was on probation at the time of the offense; (5) Norman had pending firearm charges in Maryland at the time of the offense and was wanted for failing to appear in connection with the case; (6) Norman used illicit drugs; (7) in the past, Norman participated in and/or successfully completed the Key/Crest program(s) and/or Boot Camp; (8) Norman's prior criminal history, including any juvenile and adult arrests and any treatment, rehabilitation and sentence he may have received in connection with the crimes, including but not limited to his prison records, juvenile detention records and/or probation records; (9) Norman's inability to comply with rules and regulations while in custody; (10) Norman was wearing body armor at the time of the offenses; (11) Norman was prohibited from owning or possessing a firearm at the time of the offense; (12) Norman was an admitted drug dealer. *Id.* at *6–7.

The mitigating circumstances were: (1) Norman was raised in a negative home environment of dependency, neglect, and emotional abandonment that went undetected by State authorities; (2) Norman had a grossly dysfunctional childhood and was deprived of positive family structure and appropriate supervision; (3) Norman and his family were poor and lived for extended periods in impoverished conditions; (4) Norman never had a stable childhood home, moving numerous times before age 18; (5) Norman was raised by a substance-dependent mother who exposed him as a very young child to drugs and criminal behaviors; (6) Norman's mother's substance abuse affected her ability to adequately parent him and provide him with necessary nurturing; (7) as a child, Norman was directly exposed to a significant number of family members and friends who were involved with illegal drugs; (8) Norman was sexually abused by a male babysitter at age 4; (9) Norman's need for treatment for sexual abuse went unrecognized and untreated; (10) throughout his childhood, Norman was exposed to negative comments by his mother and others about his father and his father's family that affected his emotional and moral development; (11) Norman moved frequently as a teenager after his family was evicted when their

ter balancing them, he agreed with the jury that the aggravating circumstances outweighed the mitigating circumstances and imposed a death sentence which was stayed pending the outcome of this appeal.[22] To date, neither a jury nor a judge has decided whether Norman lacked criminal responsibility under Maryland law for the Peters homicide or any other uncharged misconduct that occurred in Maryland on April 7, 2005. Thus, this central mitigating circumstance relied upon by Norman remains decided only by the Maryland prosecutors who dismissed the charges in that state.

## II. The Sixth Amendment Violation.

 Norman first contends that the trial court committed reversible error when it refused to exclude Dr. Mechanick's psychiatric evaluation and testimony from the guilt and penalty phases of the trial. Specifically, Norman claims that evidence of Dr. Mechanick's opinion must be excluded because of the State's deliberate violation of Norman's Sixth Amendment right to counsel on the Delaware charges. We review a claim alleging the denial of a constitutional right *de novo*.[23]

### A. Dr. Mechanick's psychiatric examination in Maryland.

 The Sixth Amendment, applied to the States through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defense."[24] The accused's right to counsel

---

trailer was condemned; (12) Norman lacked a stable and loving father-figure to provide for him financially or emotionally; (13) Norman had no appropriate male role models during crucial developmental stages of his life; (14) due to the lack of appropriate male role models, Norman was influenced by his mother's boyfriends and others, who were often negative influences; (15) Norman earned his GED while in the Ferris School; (16) due to emotional neglect as a child, Norman sought out love and acceptance from women, including former girlfriends' mothers, often calling them "mom"; (17) when charged with crimes in the past, Norman has pled guilty or delinquent instead of taking those cases to trial; (18) Norman was 22 years old at the time of the crimes; (19) since Norman was shot in October 2004, his father has established a loving relationship with him; (20) Norman was genuinely in pain and suffered from his gunshot wounds from October 2004 through April 2005; (21) Norman encountered Ben Green, who had sexually abused Norman and his brother as children, just before April 7, 2005; (22) at the time of the crimes, Norman was in the throes of a psychotic episode; (23) Norman's actions, behavior, and statements leading up to the crimes, were cries for help that something was wrong; (24) at the time Norman shot Jamell Weston, he lacked the substantial capacity to appreciate the wrongfulness of his conduct; (25) Norman has expressed remorse for his actions; (26) Norman has positive relations with non-family members and there are many people who love him; (27) Norman not only loves his own biological children, but has relationships with his former girlfriends' children and others' children and genuinely loves them; (28) Norman developed a loving relationship with Donesha Sturgis when he learned that he was her father; (29) Norman has the ability and desire to continue to support and parent his children from prison to the best of his ability; (30) executing Norman will cause emotional pain and suffering to his family, children, and friends; (31) the testimony of Drs. Alizai–Cowan and Mechanick (per stipulation) as to his culpability as to the Maryland charges; (32) a life sentence, if imposed, will never allow Norman to return to society. He will remain in prison without parole or any other reduction of sentence. *Id.* at *7–8.

22. *See id.* at *16.

23. *See Harris v. State,* 956 A.2d 1273, 1275 (Del.2008); *Carrigan v. State,* 945 A.2d 1073, 1075 (Del.2008); *Bentley v. State,* 930 A.2d 866, 871 (Del.2007).

24. U.S. Const. amend. VI; *see Johnson v. Zerbst,* 304 U.S. 458, 463, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (6th Amendment right to counsel in criminal proceedings applies in

attaches when the adversarial judicial proceedings are commenced and continues throughout all "critical stages" of the proceedings,[25] including the deliberate elicitation by law enforcement officers (and their agents) of statements pertaining to the charge.[26] Therefore, the examination of an accused by a psychiatrist arranged by the State is considered a "critical stage" which implicates the Sixth Amendment.[27] Although there is no constitutional right to have counsel present during such an examination, counsel must be given advance notice of its nature and scope, as well as an opportunity to consult with the accused.[28]

At the time the State sent Dr. Mechanick to examine Norman, Norman had been indicted in Delaware. Consequently, the judicial proceedings against Norman in Delaware had commenced and Norman's right to counsel had attached. Although Norman had not yet been appointed counsel, we agree with the Superior Court's conclusion that "the State should have put the Court on notice of its desire to participate in the evaluation [of Norman] with

Maryland." Because it did not do so, the court properly found "that the State did violate [Norman's] Sixth Amendment right to counsel [when it] jumped the gun in its participation with the Maryland prosecutor in obtaining [Dr. Mechanick's] report." [29]

### B. *Dr. Mechanick's evaluation and testimony were admissible under exceptions to the exclusionary rule.*

Once the right to counsel has attached with respect to a particular charge, law enforcement officials may not use as evidence at trial incriminating statements "deliberately elicited" from the accused without the presence or waiver of counsel.[30] Any statements obtained in violation of the accused's right to counsel are inadmissible as evidence in the prosecution's case-in-chief.[31] The purpose of this exclusionary rule is to preserve society's interest in deterring police from violations of constitutional and statutory protections.[32] The rule, however, is not a blanket prohibition on admissibility: statements obtained in violation of the Sixth Amendment are nonetheless admissible if certain exceptions apply.[33]

federal courts); *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (6th Amendment right to counsel in criminal proceedings applies to states through 14th Amendment).

25. *Fellers v. U.S.,* 540 U.S. 519, 523, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004); *U.S. v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *accord Brown v. State,* 947 A.2d 1062, 1068 (Del.2007); *Alston v. State,* 554 A.2d 304, 308 (Del.1989).

26. *Kansas v. Ventris,* —— U.S. ——, ——, 129 S.Ct. 1841, 1845, 173 L.Ed.2d 801, 806–07 (2009); *Massiah v. U.S.,* 377 U.S. 201, 205, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

27. *Estelle v. Smith,* 451 U.S. 454, 469–72, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

28. *See Buchanan v. Kentucky,* 483 U.S. 402, 424–25, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Estelle,* 451 U.S. at 470–71, 101 S.Ct. 1866; *accord Powell v. Texas,* 492 U.S. 680, 685, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989);

*Satterwhite v. Texas,* 486 U.S. 249, 254, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).

29. *Order re: Expert Testimony, supra* note 13, at 7; *see also* DEL.SUPER. CT.CRIM. R. 12.2(c).

30. *See Fellers,* 540 U.S. at 524–25, 124 S.Ct. 1019; *Brewer v. Williams,* 430 U.S. 387, 399, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

31. *See, e.g., Michigan v. Harvey,* 494 U.S. 344, 348–49, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (excluding statement obtained in violation of 6th Amendment right to counsel); *Massiah,* 377 U.S. at 206–07, 84 S.Ct. 1199 (same).

32. *See Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

33. *See Ventris,* 129 S.Ct. at 1845 (explaining that evidence obtained in violation of the Sixth Amendment is not *per se* inadmissible, but, like evidence obtained in violation of the

▮ Two closely-related exceptions to the exclusionary rule flow from the premise that, although the government ought not profit from its own misconduct, it also should not be made worse off than it would have been had the misconduct not occurred.[34] First, where the challenged evidence has an independent source, exclusion would put the police in a worse position than they would have been absent any error or violation. Thus, under the "independent source doctrine," even if police engage in illegal investigatory activity, evidence will be admissible if it is discovered through a source independent of the illegality.[35] Second, exclusion of evidence that would inevitably have been discovered would similarly put the government in a worse position, because the police would have obtained that evidence even if no misconduct had occurred. Thus, under the "inevitable discovery doctrine," a court may admit illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means.[36]

The United States Supreme Court adopted the independent source doctrine in *Silverthorne Lumber Co. v. United States*.[37] In that case, the Court held that knowledge garnered from copies of illegally seized documents could not be used to frame an indictment or secure a subpoena for the originals.[38] The Court added, however, that facts "thus obtained [do not] become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others...."[39] More recently, the Court applied the doctrine in *Murray v. United States*.[40] In that case, the police unlawfully entered a warehouse without a warrant and observed numerous burlap-wrapped bales later found to contain marijuana. They left without disturbing the bales, kept the warehouse under surveillance, and did not reenter until they had a search warrant.[41] The police did not disclose the prior entry or rely on any observations made during the illegal entry in their warrant application.[42] The Court allowed admission of the evidence because the evidence had been obtained independently of the initial illegality.[43]

Fourth Amendment, should be subjected to "an exclusionary-rule balancing test").

**34.** *Murray v. U.S.*, 487 U.S. 533, 537, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *see also Nix*, 467 U.S. at 443, 104 S.Ct. 2501.

**35.** *Silverthorne Lumber Co. v. U.S.*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Murray*, 487 U.S. at 537, 108 S.Ct. 2529; *accord U.S. v. Burton*, 288 F.3d 91, 100–01 (3d Cir.2002) (applying independent source doctrine and declining to suppress evidence from the search of the trunk of a vehicle because, even assuming defendant's arrest was unlawful, police had a lawful independent source under the automobile exception because they had probable cause to conclude the vehicle was involved in an illegality).

**36.** *Nix*, 467 U.S. at 444, 104 S.Ct. 2501; *accord U.S. v. Vasquez De Reyes*, 149 F.3d 192, 194–96 (3d Cir.1998) (applying the inevitable discovery doctrine, but suppressing the defendant's statement because the government failed to carry its burden of proof that the

government agents, following routine procedures, would inevitably have uncovered the evidence).

**37.** 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

**38.** *See id.* at 391, 40 S.Ct. 182.

**39.** *Id.* at 392, 40 S.Ct. 182.

**40.** 487 U.S. 533, 535, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

**41.** *See id.*

**42.** *See id.* at 536, 108 S.Ct. 2529.

**43.** *See id.* at 537, 108 S.Ct. 2529; *see also Segura v. U.S.*, 468 U.S. 796, 814, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (evidence admissible because search warrant was issued solely on basis of information known before previous illegal entry and items not seen by officers during prior illegal search).

The United States Supreme Court adopted another exception, the inevitable discovery doctrine, in *Nix v. Williams.*[44] In that case, the defendant was arrested for the kidnapping and murder of a ten-year-old. While transporting the defendant, a police officer violated the defendant's right to counsel by interrogating him, thereby discovering the location of the body. By that time, the police had independently begun an exhaustive search that (subsequent testimony revealed) would have discovered the body within hours of the defendant's disclosure of the location.[45] Thus, the Court held that the improperly acquired information could be admitted because the body would have inevitably been discovered during the course of the lawful search already underway.[46]

1. *Dr. Mechanick's opinion as to Maryland law was admissible under the Independent Source Doctrine.*

■ Although the Superior Court analyzed the admissibility of Dr. Mechanick's evaluation using a harmless error standard, the court's finding comports with an analysis under the independent source and inevitable discovery exceptions to the exclusionary rule. Dr. Mechanick examined Norman on January 28, 2006, pursuant to an order from the Maryland Circuit Court, and issued two psychiatric evaluations, one for Maryland authorities and one for Delaware authorities. Dr. Mechanick's opinion as to whether Norman satisfied the Maryland definition of "not criminally responsible" did not violate Norman's Sixth Amendment right to counsel. Norman's Maryland defense counsel was given advance notice of Dr. Mechanick's examina-

tion and had an opportunity to consult with Norman regarding it. Thus, Dr. Mechanick's opinion regarding whether Norman was "not criminally responsible" under Maryland law was discovered through a source independent of the illegality and was admissible in his Delaware trial pursuant to the Independent Source Doctrine.

Moreover, the Maryland evaluation was neither confidential nor privileged, and its use was not limited to the proceedings in Maryland.[47] Each expert that examined Norman in Maryland likewise became a potential expert witness in the Delaware case. Even if Delaware prosecutors had not been involved in Dr. Mechanick's evaluation, they could have later asked him to apply Delaware law to the information he gathered in his evaluation.

2. *Dr. Mechanick's opinion was admissible under the Inevitable Discovery and the Independent Source Doctrines.*

■ Dr. Mechanick's opinion as to whether Norman satisfied the Delaware definition of NGRI or GBMI was also admissible under the Inevitable Discovery Doctrine. To the extent Dr. Mechanick based his opinion on his review of the history given by Norman to his own psychiatric experts and his interviews with Norman in Delaware, Norman's statements would inevitably have been discovered during the course of a lawful investigation. Because the defense placed Norman's sanity in issue, the outcome in this case would have been no different even if Norman had the benefit of Delaware counsel at Dr. Mechanick's evaluation in Maryland. A

44. 467 U.S. 431, 446–47, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

45. *Id.* at 434–36, 439, 104 S.Ct. 2501.

46. *Id.* at 448–50, 104 S.Ct. 2501.

47. Del. R. Evid. 503(3) ("There is no privilege under this rule for a communication relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which the patient relies upon the condition as an element of the patient's claim or defense....").

mental health defense was the only reasonable defense strategy available in either Maryland or Delaware, given the overwhelming evidence against Norman. Consequently, Delaware counsel would likely have advised Norman to participate in the Maryland court-ordered evaluation by Dr. Mechanick, or else risk sabotaging his Maryland defense. Assuming counsel followed this course, nothing in the Delaware case would be different.

At oral argument before this Court, defense counsel urged that Norman had the right to make the strategic, if foolhardy, choice to refuse to submit to the evaluation or refrain from answering certain questions. But, even if counsel gave such guidance, it would not have changed the outcome of Norman's Delaware trial. Assuming counsel could have threaded the eye of the needle and achieved an evaluation admissible in Maryland without any information regarding Norman's drug use, that finesse would have been short-lived. Under Superior Court Criminal Rule 12.2, in order to assert the mental illness defense in Delaware, a defendant *must* sub-

mit to an evaluation of the State's chosen expert.[48] Thus, even if Norman had evaded questions regarding drug use during the Maryland evaluation, he would have been required either to answer them in Delaware, or else abandon his mental health defense completely, making Dr. Mechanick's evaluation irrelevant. Under either scenario, the end result of the Delaware trial would be the same guilty verdict.[49]

Furthermore, Dr. Mechanick could have based his expert opinion upon other admissible evidence, specifically, the same history gathered in the evaluations of Dr. Brandt and/or Dr. Alizai–Cowan.[50] The Maryland court-ordered evaluations of Norman by Drs. Brandt and Alizai–Cowan were not confidential, privileged, or limited in use to the Maryland proceedings.[51] Both Maryland doctors presented their evaluation and testimony in the Delaware case on behalf of Norman, and Dr. Mechanick testified in rebuttal. There is substantial similarity in the information found in each report, including the evidence regarding Norman's drug use, medical history, and symptoms of psychosis.[52] Nor-

---

**48.** SUPER. CT.CRIM. R. 12.2(c).

**49.** On one hand, if Norman delayed the evaluation by Dr. Mechanick, the State would have hired him later and, in the hypothetical trial, the jury would have been presented with the same evidence as in the actual trial, from which it reached a general verdict of guilty. If Norman had refused the evaluation by the State's expert, he would have been prevented from pleading NGRI or GBMI and the jury's only options would have been a general verdict of guilty or not guilty.

**50.** *See* DEL. R. EVID. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing"). The reports submitted in this matter indicate that forensic psychiatrists rely on data recorded by other evaluators. Dr. Brandt, for example, analyzed the reports of Drs. Alizai–Cowan and Mechanick. Also, all

three evaluators relied on the report of Dr. Donohue at the Perkins facility.

**51.** *See* DEL. R. EVID. 503(3).

**52.** Dr. Mechanick based his conclusion that Norman suffered from a drug-induced delirium primarily on Norman's medical history and drug use. MECHANICK FIRST REPORT, *supra* note 11, at 62–64. Based, in part upon Dr. Donohue's evaluation while Norman was at Perkins, Dr. Mechanick noted that Norman had no prior history of psychotic episodes. *Id.* at 35–39, 57–60. Dr. Alizai–Cowan included the same data in her report, ALIZAI–COWAN REPORT, *supra* note 9, at 21, 24–26, as did Dr. Brandt, BRANDT REPORT, *supra* note 8, at 19–21. Dr. Mechanick also noted that Norman had a history of drug abuse and reports indicated that Norman consumed cocaine, ecstasy and marijuana prior to his arrest. MECHANICK FIRST REPORT, *supra* note 11, at 5, 40–42. Dr. Alizai–Cowan included the same data in her report, ALIZAI–COWAN REPORT,

man's answers to drug-use questions are consistent among all three doctors.[53] Thus, based on the information lawfully obtained by the Maryland experts, Dr. Mechanick had an independent evidentiary basis to evaluate whether Norman met Delaware's definition of "not guilty by reason of insanity" or "guilty but mentally ill." Finally, Dr. Mechanick's subsequent examinations of Norman performed in Delaware did not violate the Sixth Amendment; thus, he could render an identical opinion based upon other admissible evidence. Accordingly, the Superior Court correctly admitted Dr. Mechanick's opinion notwithstanding the Sixth Amendment violation.[54]

### III. The Application of 11 Del. C. § 4209(e)(1)k.

■ Norman next contends that the aggravating factor used to elevate his life sentence to a sentence of death was improperly applied to his conduct. The sole statutory aggravator pursued by the State in this case was: "The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct."[55] Norman argues that Delaware lacked jurisdiction to impose a death sentence based on a Maryland homicide. Next, he argues that the "course of conduct" statutory aggravator is vague and overbroad as applied to him. He also argues that the State is collaterally estopped from punishing him for a death that Maryland did not consider punishable. We review questions of law, including the interpretation of the statutory aggravating factors, *de novo*.[56]

### A. Unadjudicated criminal conduct in other states may be used to establish the "course of conduct" statutory aggravator.

■ Norman asserts that under 11 *Del. C.* § 204(a)(1), Delaware may punish only where "[e]ither the conduct or the result which is an element of the offense occurs within Delaware...."[57] He argues

---

*supra* note 9, at 2, 18–19, as did Dr. Brandt, BRANDT REPORT, *supra* note 8, at 35–36, 39.

Further, Dr. Mechanick considered Dr. Alizai–Cowen's evaluation, but determined that the facts on which both reports were based were more supportive of his conclusion. MECHANICK FIRST REPORT, *supra* note 11, at 26–31, 60. When asked to review Dr. Brandt's findings, he found that her reports "underscore my previous opinions about the unreliability of Mr. Norman's statements, particularly regarding his past drug use and his substance use up to the time of the charges.... It remains my opinion that ... [Mr. Norman's] voluntary use of substance was the proximate cause of his psychiatric condition at the time of the conduct charged." STEPHEN MECHANICK, SUPPLEMENTAL REPORT RE: ALLISON LAMONT NORMAN, 2–4, 7–9 (Jan. 26, 2007).

Finally, in order to address the contrary information elicited by Dr. Brandt regarding Norman's prior instances of psychotic episodes, Dr. Mechanick reevaluated Norman. At that time, Norman denied having had any psychotic symptoms prior to using ecstasy and claimed he had experienced no odd thoughts or experiences since August 2005. He also corroborated his prior statements on drug use. Therefore, Dr. Mechanick's conclusion remained unchanged. MECHANICK SECOND REPORT, *supra* note 14, at 1–5.

53. *Compare* MECHANICK FIRST REPORT, *supra* note 11, at 49, *with* ALIZAI-COWAN REPORT, *supra* note 9, at 18–19, 28–31, *and* BRANDT REPORT, *supra* note 8, at 35–36.

54. Dr. Mechanick's testimony, having been properly admitted during the guilt phase, could also be considered by the jury during the penalty phase of the trial. *Deputy v. State*, 500 A.2d 581, 600 (Del.1985); *Flamer v. State*, 490 A.2d 104, 125 (Del.1983).

55. 11 *Del. C.* § 4209(e)(1)k.

56. *See Gattis v. State*, 955 A.2d 1276, 1280–81 (Del.2008); *Burrell v. State*, 953 A.2d 957, 960 (Del.2008); *Williams v. State*, 818 A.2d 906, 909 (Del.2002).

57. 11 *Del. C.* § 204(a)(1).

that because Peters's death neither occurred in nor was caused by conduct in Delaware, by using that homicide to elevate his life sentence for the murder of Weston to a sentence of death, the State is punishing him for conduct it lacks jurisdiction to adjudicate.

Delaware has historically admitted evidence of criminal conduct in other states for purposes of criminal sentencing proceedings. For example, in *Stewart v. State*,[58] the defendant was sentenced as a repeat offender after being convicted of driving under the influence ("DUI") in Delaware because of his prior DUI conviction in Florida. On appeal, we noted that the sentencing statute expressly allowed convictions or findings of guilt from "a similar statute of any state or local jurisdiction" within five years to constitute a prior offense, enabling [the defendant] to be correctly sentenced as a repeat offender.[59] Similarly, Delaware's habitual offender statute expressly permits the consideration of a conviction from another state in tallying felonies for purposes of sentencing:

> Any person who has been 2 times convicted of a felony or an attempt to commit a felony hereinafter specifically named, *under the laws of this State, and/or any other state, United States or any territory of the United States,* and who shall thereafter be convicted of a subsequent felony hereinafter specifically named, or an attempt to commit such specific felony, is declared to be an ha-

bitual criminal, and the court in which such third or subsequent conviction is had, in imposing sentence, shall impose a life sentence upon the person so convicted unless the subsequent felony conviction requires or allows and results in the imposition of capital punishment.[60]

Another example directly relating to the death penalty statute is Delaware's "prior felony" statutory aggravator, which allows a convicted murderer to be sentenced to death if the defendant "was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person."[61] In *Red Dog v. State*,[62] the defendant had previously been convicted of robbery in Montana in 1973, and two counts of murder in the second degree in California in 1978. We found that these out-of-state convictions—which were evidenced by testimony of eyewitnesses and investigating officers, certified copies of court records, and admission by the defendant—were sufficient to establish the statutory aggravating circumstance beyond a reasonable doubt.[63]

Many other jurisdictions have statutory aggravators that are substantially similar to Delaware's "prior felony" aggravator.[64] Like Delaware, they have allowed the use of prior convictions in other states to support their own state's use of that aggravator in sentencing. Some states do so pursuant to express language in the statute itself.[65] One such state is Illinois, where a defendant becomes eligible for the death

**58.** 930 A.2d 923, 925 (Del.2007).

**59.** *Id.* at 926; 21 *Del. C.* §§ 4177B(e)(1)a., (2)a.

**60.** 11 *Del. C.* § 4214(b) (emphasis added). Use of convictions from other states are limited to those crimes that "would support a conviction for one of the felonies enumerated" in Delaware's statute. *Fletcher v. State*, 409 A.2d 1254, 1255 (Del.1979).

**61.** 11 *Del. C.* § 4209(e)(1)i.

**62.** *Red Dog v. State*, 616 A.2d 298, 303 (Del. 1992).

**63.** *Id.* at 307.

**64.** *See* Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345, 417 n. 374 (1998).

**65.** See *id.* reciting the statutes of numerous states, including those which expressly identify prior convictions in other states. *E.g.* ARIZ.

penalty if "the defendant has been convicted of murdering two or more individuals under [Illinois law] or *under any law of the United States or of any state which is substantially similar to* [Illinois law] regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts ..."[66] Other states, including Delaware, do so without such express language in the statute.[67] For example, the Supreme Court of Nevada upheld the death sentence for a defendant convicted of first-degree murder based on a sixteen-year-old conviction for manslaughter in Iowa.[68] The conviction was used as evidence to support the use of the "prior felony" statutory aggravator.[69]

Other states have even allowed a guilty plea from another state proceeding (as opposed to a jury conviction) to be admitted in the sentencing phase of a criminal trial. The Supreme Court of Mississippi upheld the death sentence for a defendant who was convicted of capital murder, where the jury based the "prior felony" statutory aggravator (among other statutory aggravators) upon the defendant's guilty plea to a murder in Tennessee that had occurred just hours after the murder for which the defendant was charged.[70] Although the Mississippi court found that the defendant's claim that the jury was improperly instructed was procedurally barred, it agreed that the statutory language permitted the use of an out-of-state guilty plea to a felony involving the use or threat of violence satisfied the statutory aggravator.[71] Similarly, the Supreme Court of Washington upheld the death sentence for a defendant who was convicted of two

REV.STAT. ANN. § 13–703(F)(1) ("The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable."); COLO.REV.STAT. § 16–11–802(5)(b) ("The defendant was previously convicted in this state of a class 1 or 2 felony involving violence ... or was previously convicted by another state of the United States of an offense which would constitute a class 1 or 2 felony involving violence...."); 720 ILL. COMP. STAT. 5/9–1(b)(3) ("The defendant has been convicted of murdering two or more individuals under [Illinois law] or under any law of the United States or of any state which is substantially similar to [Illinois law] regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts...."); 42 PA. CONS.STAT. § 9711(d)(12) ("The defendant has been convicted of voluntary manslaughter ... or a substantially equivalent crime in any other jurisdiction....").

**66.** 720 ILL. COMP. STAT. 5/9–1(b)(3) (emphasis added); *see also People v. Johnson,* 182 Ill.2d 96, 230 Ill.Dec. 945, 695 N.E.2d 435, 442 (1998) ("[A]fter committing a murder, the commission of additional murders in Illinois or another jurisdiction would make [a defendant] eligible for the death penalty.").

**67.** See Kirchmeier, *supra* note 64, at 417 n. 374 reciting the statutes of numerous states, including those which do not expressly identify prior convictions in other states. *E.g.* ALA. CODE § 13A–5–49(2) ("The defendant was previously convicted of another capital offense or a felony involving the use of threat or violence to the person."); N.J. STAT. § 2C:11–3(4)(a) ("The defendant has been convicted, at any time, or another murder."); TENN.CODE § 39–13–204(i)(2) ("The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.").

**68.** *Hogan v. State,* 103 Nev. 21, 732 P.2d 422, 423–24 (1987) (per curiam).

**69.** *Id.* Nevada's "prior felony" aggravating statute provides: "The murder was committed by a person who, at any time before a penalty hearing is conducted for the murder ... is or has been convicted of: (a) another murder ... or (b) a felony involving the use or threat of violence to the person of another...." NEV.REV.STAT. § 200.033(2).

**70.** *Doss v. State,* 709 So.2d 369, 373 n. 1, 401 (Miss.1996).

**71.** *Id.* at 392–93.

counts of murder.[72] It affirmed the trial court's decision to admit evidence of the defendant's guilty plea to an assault charge in Montana as an aggravation consideration (not a statutory aggravator). The Washington court reasoned that despite case law prohibiting the evidence of alleged criminal behavior other than convictions, the defendant's guilty plea was "sufficiently reliable to warrant admission." [73]

Finally, other jurisdictions have used evidence of unadjudicated criminal conduct in states outside of their own to support either aggravation in general or specific statutory aggravators. For example, California has allowed unadjudicated criminal conduct to be presented in the sentencing phase of a criminal trial to support aggravation (and not a specific statutory aggravator). The Supreme Court of California allowed evidence of six murders in Oregon and two murders in Michigan to be admitted in the sentencing of a criminal defendant who had been convicted of sixteen murders, representing victims from over the course of more than a ten year span, in one trial.[74] The Supreme Court of Louisiana has also allowed evidence of unadjudicated criminal conduct that is relevant and reliable.[75] For example, in *State v. Comeaux*,[76] the court allowed evidence of an unadjudicated rape and murder in Arkansas to support Louisiana's "prior felony" statutory aggravator for the rape and two murder charges for which he was prosecuted in Louisiana.[77]

Unadjudicated criminal conduct has also been used to support the use of the "course of conduct/multiple-killing" statutory aggravator. In two Texas cases, the Texas Court of Criminal Appeals affirmed the use of evidence of a murder in Kansas to show that the defendants had engaged in a course of conduct that elevated a murder in Texas to a capital offense.[78] Addressing the challenge to the use of a murder outside of Texas to elevate a charged murder to capital murder in Texas, the court held: "this state has the authority to prosecute the offense even though some of the elements of the aggravating offense [*i.e.*, the murder of another person in the same course of conduct[79]]

**72.** *State v. Pirtle*, 127 Wash.2d 628, 904 P.2d 245 (1995).

**73.** *Id.* at 268.

**74.** *People v. Kraft*, 23 Cal.4th 978, 99 Cal. Rptr.2d 1, 5 P.3d 68, 100–02 (2000).

**75.** *State v. Comeaux*, 699 So.2d 16, 19–23 (La.1997); *see also State v. Bourque*, 622 So.2d 198 (La.1993) *overruled on other grounds by Comeaux*, 699 So.2d 16.

**76.** *State v. Comeaux*, 699 So.2d 16, 19, 23–24 (La.1997). The court discussed the need to ensure that the presentation of unadjudicated conduct does not "inject an arbitrary factor" into the sentencing proceeding, but did not comment on the fact that the unadjudicated crimes in this case were outside the state. *Id.* at 19–23.

**77.** The jury, however, also found four other statutory aggravators on which to base the death sentence. *Id.* at 19 ("that the offense was committed during the perpetration ... of an aggravated burglary; that the defendant knowingly created a risk of death or great bodily harm to more than one person; that the offense was committed in an especially heinous, atrocious, or cruel manner.... That the offense was committed during the perpetration ... of an aggravated rape.").

**78.** *Galloway v. State*, 2003 WL 1712559 (Tex. Crim.App. Jan. 29, 2003); *Bayless v. State*, 2003 WL 21006915 (Tex.App. May 6, 2003).

**79.** Texas's course of conduct statutory aggravator provides that a murder will be prosecuted as capital murder if "the person murders more than one person ... during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." TEX. PENAL CODE § 19.03(a)(7)(B).

occurred outside the state's boundaries."[80] The court also found no geographical or time restrictions in the statutory aggravator itself that would have precluded it from using the Kansas murder.[81]

An Ohio case provides yet another example. There, the defendant admitted to killing five people in four states within two years. After pleading guilty and being convicted of one of the murders in Alaska, he was prosecuted for another murder in Ohio.[82] A statutory aggravator that the prosecution relied on in seeking the death penalty was the "course of conduct" aggravator. Although the Supreme Court of Ohio did not specifically address the fact that the other murders had occurred in other states, it declared that "the evidence established beyond a reasonable doubt that the murder ... was part of a course of conduct involving the purposeful killing of five people."[83]

■ In this case, the State relied on a second, unadjudicated homicide in Maryland as the evidence of Delaware's "course of conduct / multiple-killing" statutory aggravator, a position supported by Delaware's jurisprudence. First, as discussed above, Delaware has a history of considering criminal conduct outside of the state in its procedures for sentencing criminal defendants. Additionally, case law throughout the country demonstrates that criminal conduct occurring outside the state of prosecution has been used in criminal sentencing proceedings. Second, although the conduct was unadjudicated, the jury was

required to find the existence of the killing of Peters beyond a reasonable doubt. The jury instructions provided by the lower court adequately instructed the jurors of this requirement, which stems from the United States Supreme Court's decision in *Ring v. Arizona.*[84] Therefore, Norman received the procedural protections of the jury having to find that he caused the death of the second victim in Maryland beyond a reasonable doubt. Norman's claim that Delaware lacks jurisdiction to impose a death sentence in this case based upon a second death in Maryland is meritless.

B. *Section 4209(e)(1)k is not vague and overbroad as applied to Norman.*

■ Norman asserts that Section 4209(e)(1)k is vague and overbroad as applied to him because the meaning of "course of conduct" and causation are too elastic to confine state discretion and provide meaningful guidance in imposing a sentence of death. The Eighth Amendment requires that a statutory aggravating circumstance genuinely narrow the class of persons eligible for death.[85] The policy driving this requirement is to ensure that only "the worst criminals or the criminals who commit the worst crimes are selected for this punishment."[86] Furthermore, steps must be taken to ensure the death penalty is not imposed in a "wanton or freakish manner...."[87] In this context, we have explained that "[t]he language of an aggravating circumstance must provide

80. *Galloway*, 2003 WL 1712559, at *5.

81. *Id.*

82. *State v. Fautenberry*, 72 Ohio St.3d 435, 650 N.E.2d 878, 880–81 (1995).

83. *Id.* at 885.

84. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

85. *Zant v. Stephens*, 462 U.S. 862, 876–78, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

86. *Furman v. Georgia*, 408 U.S. 238, 294, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J. concurring).

87. *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

'clear and objective' standards by which the sentencing authority's discretion may be guided and channeled so as to avoid an arbitrary or capricious infliction of the death sentence." [88] If a substantial risk exists for an arbitrary or capricious application, the statute that defined the aggravating circumstances is unconstitutional.[89]

In *Tuilaepa v. California*,[90] the United States Supreme Court set forth two requirements for an aggravating circumstance to be found constitutional. First, the circumstance may not be overbroad—meaning that rather than being applicable to every defendant convicted of a murder, it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.[91]

■ Section 4209(e)(1)k is not overbroad. An aggravating circumstance is overbroad "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty...." [92] In *State v. Chaplin*,[93] the Delaware Superior Court examined the constitutionality of former Section 4209(e)(1)n, which provided that "the murder was outrageously or wantonly vile, horrible or inhuman." [94] Relying on the United States Supreme Court's decision in *Godfrey v. Georgia*,[95] the court found the language of this factor unconstitutional, because "there is nothing in these few words standing alone that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence.... There is no principled way to distinguish this case in which the death penalty was imposed from the many cases in which it was not." [96] Here, even by allowing evidence of an unadjudicated homicide from another state to establish the aggravating factor, Section 4209(e)(1)k still applies only where the defendant convicted of murder has caused the death of at least two people. No sentencer could fairly conclude that that provision applies to every defendant eligible for the death penalty.

Nor is Section 4209(e)(1)k vague. In *Tuilaepa*, the United States Supreme Court noted that it is necessary only that the narrowing factors have some "common-sense core of meaning ... that criminal juries should be capable of understanding." [97] We applied a similar standard in

**88.** *Petition of State for Writ of Mandamus*, 433 A.2d 325, 326 (Del.1981); *State v. White*, 395 A.2d 1082, 1091 (Del.1978).

**89.** *See Petition of State*, 433 A.2d at 326 (citing *Gregg*, 428 U.S. at 188, 96 S.Ct. 2909; *Furman*, 408 U.S. 238, 92 S.Ct. 2726).

**90.** 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

**91.** *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. 2630 (citing *Arave v. Creech*, 507 U.S. 463, 471, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)).

**92.** *Arave*, 507 U.S. at 474, 113 S.Ct. 1534.

**93.** 433 A.2d 327 (1981) *mandamus denied, Petition of State*, 433 A.2d 325 (1981).

**94.** 11 *Del. C.* § 4209(e)(1)n. (1972), *invalidated by Chaplin*, 433 A.2d 327. Former section (e)(1)n. was later amended to correct the infirmity by adding more specific language to the Code. The current version reads as follows: "The murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, use of an explosive device or poison or the defendant used such means on the victim prior to murdering the victim." 11 *Del. C.* § 4209(e)(1) *l*.

**95.** 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

**96.** *Chaplin*, 433 A.2d at 329 (quoting *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. 1759).

**97.** *Tuilaepa*, 512 U.S. at 975, 114 S.Ct. 2630 (quoting *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (White, J. concurring in judgment)).

868

*State v. White*,[98] although it was decided sixteen years before *Tuilaepa*, when determining the validity of two statutory aggravating circumstances described solely as the victim being "elderly" or "defenseless"[99] We explained that "the constitutionality of a death penalty statute rests upon the premise that the sentencing authority's discretion in imposing the death penalty is guided and channeled by clear and objective statutory standards."[100] In finding that the two aggravating circumstances were unconstitutionally vague, we noted that "[i]t cannot be said that the words have a common and ordinary meaning sufficiently definite to meet their usage in the context of the Statute," and that "[m]anifestly, words such as 'elderly' and 'defenseless', without legislative definition of scope and meaning, are susceptible of widely differing interpretations."[101] Thus, we concluded that "by the use of such vague terminology, there is substantial risk that sentencing authorities will inflict the death penalty in an arbitrary and diversified manner. Such vague terms have particular constitutional shortcomings and are particularly unacceptable when they are applied to the imposition of the death penalty."[102]

Such vague terms are not present in Section 4209(e)(1)k. Unlike the terms at issue in *White*, the "course of conduct" factor applied in this case conveys the common-sense core meaning that those whose actions result in multiple deaths should be punished more harshly. The use of the phrase "course of conduct" implicates a broad, fact-based analysis to de-

termine whether any circumstances tie the multiple deaths together. Additionally, the second death need only be "a probable consequence of defendant's conduct," meaning the defendant need not have intended to kill the second victim or that the defendant be convicted of that second homicide. This language is sufficiently clear and objective to provide guidance to Delaware juries.

## C. *Delaware is not collaterally estopped from using a homicide in Maryland.*

Norman asserts that the State is collaterally estopped from using the homicide of Peters to impose a death sentence because Maryland found Norman not criminally culpable for the homicide under its own law. The doctrine of collateral estoppel states that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."[103] To trigger collateral estoppel, each of the following four factors must be present: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action."[104] In this case, where a dismissal was entered by Maryland prosecutors, none of the factors are present and

**98.** 395 A.2d 1082 (1978).

**99.** 11 Del. C. § 4209(e)(1)r., s. (1972), *invalidated by White*, 395 A.2d 1082.

**100.** *White*, 395 A.2d at 1090.

**101.** *Id.* at 1090, 1091.

**102.** *Id.* at 1091.

**103.** *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

**104.** *Capano v. State,* 889 A.2d 968, 986 (Del. 2006) (Steele, C.J. dissenting); *Betts v. Townsends, Inc.,* 765 A.2d 531, 535 (Del.2000); *see also* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §§ 132–1, 132.04[1][a][ii] (3d ed. 1997).

Norman's collateral estoppel challenge must fail.

## D. *The aggravating circumstance is supported by the evidence.*

 The evidence supports the jury's finding of the existence of the sole aggravating circumstance that Norman's course of conduct resulted in the deaths of two or more persons and that those deaths were a probable consequence of his conduct. By convicting Norman of murder in the first degree for the death of Weston, the State proved beyond a reasonable doubt that Norman caused one death. The State also proved beyond a reasonable doubt that Norman caused a second death. Several witnesses testified, and ample forensic data was introduced, to establish that after asking Peters for a ride, Norman got out and ran to the driver's side of Peters's SUV, said "No, you hold up motherfucker," and shot Peters. The evidence supports the jury's finding that Peters's death was caused by, and was the probable consequence of, Norman's conduct.

## IV. Criminal Responsibility under Maryland Law

Norman next contends, in the alternative, that even if the homicide in Maryland can be used as an aggravating circumstance, his lack of criminal responsibility for that conduct, if established, is a relevant mitigating circumstance. Here, the defense neither requested an instruction on Maryland law relating to lack of criminal responsibility nor objected to the instructions given by the court at the penalty phase of Norman's trial. In context, the defense did not do so after the trial court ruled that the evidence would be "screened" through Delaware law.

 In the exercise of its appellate authority, this Court will generally decline to review contentions not raised below and not fairly presented to the trial court for decision.[105] But, we may excuse a waiver if we find that "the trial court committed plain error requiring review in the interests of justice."[106] "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[107] "Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[108]

 Proof of the Delaware statutory aggravator is an issue separate from whether there is legal mitigation in Maryland for the conduct which occurred there. Section 4209 allows the defendant to present evidence of *any mitigating circumstance*[109] and requires the jury and judge to weigh "*all relevant evidence in ... mitigation* which bear upon the particular

---

**105.** Sup.Ct. R. 8; *see also Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986); *Jenkins v. State,* 305 A.2d 610 (Del.1973).

**106.** *Monroe v. State,* 652 A.2d 560, 563 (Del. 1995); *Mathis v. State,* 950 A.2d 659 (Del. 2008).

**107.** *Wainwright,* 504 A.2d at 1100; *Dutton v. State,* 452 A.2d 127, 146 (Del.1982).

**108.** *Wainwright,* 504 A.2d at 1100; *Bromwell v. State,* 427 A.2d 884, 893 n. 12 (Del.1981).

**109.** 11 *Del. C.* § 4209(c)(1) (providing that the defendant may present evidence "relating to any mitigating circumstance"), (c)(4) (providing that jury instructions shall include directions "to weigh and consider any mitigating circumstances"), (g)(2)a. (providing that, on appellate review of the penalty of death, this Court will consider "the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender ...").

circumstances or details of the commission of the offense and the character and propensities of the offender. . . ." [110] This procedure is required in capital cases by the Eighth and Fourteenth Amendments to the United States Constitution.[111] Pursuant to this mandate, when the State uses the defendant's unadjudicated conduct in another jurisdiction to establish an aggravating factor, the defendant's lack of criminal responsibility under the law of that jurisdiction is a relevant mitigating circumstance which, if offered by the defendant, must be considered by the jury and judge.[112] Just as the jury must be properly instructed on Delaware law applicable to the aggravating factor, it must also be properly instructed on the non-Delaware law applicable to any legal mitigation of conduct in another state.

 Here, the trial court ruled before trial and, again, before the start of the penalty phase, that "[i]ssues of the Defendant's legal competency for his actions in Maryland will need to be addressed but these decisions will be filtered through the Delaware standards." [113] The State placed Norman's mental state in Maryland in issue at the penalty phase by relying upon his conduct there to prove both statutory and non-statutory aggravating circumstances. Norman responded with mitigation evidence that he lacked criminal responsibility in that jurisdiction. Evidence relevant to Norman's criminal responsibility under Maryland law was presented to the jury by stipulation.[114] The Stipulation

**110.** 11 *Del. C.* § 4209(c)(3)a.2., (d)(1) (emphasis added).

**111.** *Lockett v. Ohio*, 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (finding "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original); *cf. Eddings v. Oklahoma*, 455 U.S. 104, 110–12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (*Lockett* adopted by majority of the Court); *White*, 395 A.2d at 1088 (finding Section 4029 satisfies the constitutional standards explained in *Lockett* and its progeny).

**112.** *See Sanders v. State*, 585 A.2d 117, 134 (Del.1990) (holding that a verdict of guilty but mentally ill establishes mitigation as a matter of law at the penalty phase of a capital trial).

**113.** *Order re: Out–of–State Death, supra* note 16, at 2. Prior to trial, the question was raised whether the case would proceed to a penalty phase. At the close of the pre-trial hearing on the defense's motion to suppress Dr. Mechanick's testimony, the following colloquy occurred:

> [The Court]: He cannot appreciate the wrongfulness of his conduct and conform.

> [Prosecutor]: Because of something he did of his own volition.

> [The Court]: Correct. Correct. But you still want to execute somebody who could not conform their conduct because of their mental illness regardless because they did the voluntary intoxication. That is something I am having difficulty with because regardless of how bad he may be in the sense that he allegedly killed two people and wounded several others ... everybody that has examined him, including your own doctor, says he didn't know what he was doing. But he is criminally responsible. That is much different, being criminally responsible and seeking the death penalty against somebody who didn't know what they were doing at the time.

Due to the trial court's concerns, it requested briefing on the defense motion to preclude the death penalty based on the Eighth Amendment and its impact on executing Norman due to the unanimous opinion that he lacked substantial capacity to appreciate the wrongfulness of his conduct at the time of the offenses. At the conclusion of the briefing, the trial court inquired of the State if it still intended to seek the death penalty. The prosecutors responded in the affirmative.

**114.** See *supra* note 19 for a copy of the Stipulation.

included Dr. Mechanick's opinion that Norman would not meet the criteria for "not criminally responsible" under Maryland law, and also Dr. Alizai–Cowan's contrary opinion that "Mr. Norman met the standard for not criminally responsible under Maryland law."

Although the Stipulation purported to quote Maryland law, it did not explain how that law should be applied to determine Norman's mental state at the time of the Peters homicide or his other criminal conduct in Maryland.[115] Indeed, the Stipulation itself explicitly states that the quoted Maryland law "does not provide guidance about whether Mr. Norman's psychiatric condition at the time of the conduct charged, while under the influence of substances, meets the Maryland standard for not criminally responsible." Moreover, the Stipulation contained the statement by Dr. Mechanick that "[i]t is a matter for the court to determine whether Mr. Norman's delirium at the time of the current charges is allowed under this definition as an insanity defense." As a result, the Stipulation failed to provide any clear statement of Maryland law which the jury could ap-

ply to its determination of whether Norman was criminally responsible for his conduct in that state. It is undisputed that the trial judge also provided no guidance to the jury on the Maryland standard for "not criminally responsible."

In his *Findings after Penalty Hearing,* the trial judge noted the opinions of Dr. Alizai–Cowan and Dr. Mechanick, and said: "If their opinions were found credible by a Maryland jury, under Maryland law, the defendant may possibly have been found to be not criminally responsible."[116] This issue of mitigation for Norman's conduct in Maryland remained relevant notwithstanding the dismissal of the charges there by Maryland prosecutors.[117] The jury at Norman's penalty hearing was unable to provide an advisory verdict on this proffered mitigation, because it was not provided guidance on the applicable Maryland law. That is a material defect which deprived Norman of a substantial right and jeopardized the fairness and integrity of the penalty hearing.

We recognize that this capital case presents issues of first impression involving lack of criminal responsibility for conduct

115. Although the portions of Dr. Mechanick's report read into evidence as part of the Stipulation purported to quote from the "Maryland Legal Code," that description of the text is inaccurate. The Maryland statute on the test for criminal responsibility provides:
 (a) A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to: (1) appreciate the criminality of that conduct; or (2) conform that conduct to the requirements of law.
 (b) For purposes of this section, "mental disorder" does not include an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct
Md.Code Ann.Crim. Proc. § 3–109. This statute was not explained to the jury or cited by the trial judge in his sentencing decision. How-

ever, the language in the Stipulation relating to voluntary intoxication, which the parties agree is a correct statement of Maryland law, appears to be taken from two Maryland Court of Special Appeals cases: *Parker v. State,* 7 Md.App. 167, 254 A.2d 381 (1969) and *Porreca v. State,* 49 Md.App. 522, 433 A.2d 1204 (1981).

116. *Findings After Penalty Hearing, supra* note 12, at *29.

117. The State has conceded that, but for the homicide in Maryland, this would not be a capital case. At oral argument before this Court, the following colloquy occurred:
 Justice Holland: Do you agree that if the only homicide that had occurred was the Delaware homicide, that this is not a capital case?
 Mr. Wallace: Yes.

outside of Delaware. Nonetheless, Delaware law and the Eighth Amendment require that the jury consider matters relating to any mitigating circumstance.[118] This includes lack of criminal responsibility for an alleged aggravating circumstance. The absence of any guidance on Maryland law relating to Norman's lack of criminal responsibility for his conduct in Maryland made it impossible for the jury either to decide the existence of a critical mitigating circumstance relied upon by the defense or to weigh that circumstance in the determination of sentence.

■ Where the sentencer in a capital case is prevented from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation, there is a "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."[119] Accordingly, we must reverse the death sentence imposed and remand this matter to the Superior Court for a new penalty hearing.[120]

## VI. Conclusion

We **AFFIRM** the judgments of the Superior Court with the exception of the death sentence imposed. We **REVERSE** the death sentence and **REMAND** this matter for a new penalty hearing.

---

118. *See* 11 *Del. C.* § 4209(c); *Lockett*, 438 U.S. at 604–05, 98 S.Ct. 2954; *White*, 395 A.2d at 1088.

119. *Lockett*, 438 U.S. at 605, 98 S.Ct. 2954.

120. Because we remand for a new penalty hearing, other issues raised by Norman relating to the Eighth Amendment and our mandatory proportionality review pursuant to 11 *Del. C.* § 4209(g) are not ripe for review.