LAMARIS WESCOTT, Defendant Below-Appellant,
v.
STATE OF DELAWARE Plaintiff Below-Appellee.
No. 202-2009.
Supreme Court of Delaware.
Submitted: July 27, 2009.
Decided: October 13, 2009.
Before STEELE, Chief Justice, BERGER, and RIDGELY, Justices.

ORDER
HENRY DuPONT RIDGELY, Justice.
This 13th day of October 2009, it appears to the Court that:
(1) Defendant-Appellant Lamaris Wescott ("Wescott") appeals his Superior Court conviction of possession of a firearm by a person prohibited. Wescott raises two arguments on appeal. First, he contends that the Superior Court erred as a matter of law when it denied his motion to dismiss the indictment on grounds of double jeopardy and collateral estoppel. Second, he argues that the Superior Court abused its discretion when it imposed the maximum possible term of incarceration without a full explanation of the reasons for the sentence. We find no merit to Wescott's appeal and affirm.
(2) On May 17, 2008, Wescott attended a large outdoor party at a residence in Frankford. The party started in the evening with a barbeque, and later a DJ was set up outside, with music playing and people dancing. Anywhere from 100-200 people attended, including many families with children. Darrin Gibbs was one of the partygoers. There is a history of conflict dating back more than six years between the Wescott and Gibbs families.
(3) At some point during the party, people started arguing and pushing and shoving outside. The music stopped and the host used the microphone to tell the troublemakers to leave. Although the Wescotts were told to leave, they stayed. The music resumed and people started dancing again. About five or ten minutes later, a few minutes after 10 p.m., the pushing and shoving started again. A lot of people tried to calm the situation down, but bottles were thrown and the dispute escalated into a fight involving five to eight males, with Wescott and his two brothers taking on Gibbs and two other men. Gibbs testified that he punched Wescott and knocked him down; and that when Wescott stood up, Wescott shot him. Gibbs testified that he saw Wescott fire at him, and heard two shots, but never really saw the gun. Jeremy Purnell, Gibbs's cousin, testified that he saw Wescott get up from the ground, and saw flashes from a gun and heard gunshots. He admitted that he did not actually see a gun, but testified that he saw flames shooting from Wescott's hand and heard gunshots, and that he was "fairly" certain that it was Wescott who fired the gun. Purnell testified that he heard five gunshots and saw Wescott fire one toward the ground, one at Gibbs, and three into the air. Tasha Toppin, an acquaintance of Gibbs, was standing near Gibbs and heard two shots fired, but did not see who fired them and did not see them hit Gibbs.
(4) Gibbs was shot about two inches above his heart. He tried to run, but fell down. While Toppin and Gibbs's girlfriend administered first aid and waited for the ambulance, pandemonium ensued: some fled for their cars, while others began arguing and yelling at Wescott and his brother. Police from several jurisdictions, both state and local, responded. When they arrived at the scene, there was hostility among the partygoers towards the police and paramedics concerning their response time and effort. Despite the large size of the crowd, few claimed to have seen anything. Even Purnell was reluctant to speak at first, but ultimately identified Wescott as the shooter. Gibbs testified that he told a police officer that Wescott shot him, but the officer and Toppin testified that Gibbs told the officer that he did not know who shot him. Gibbs was initially treated at the scene in an ambulance, and then flown to the hospital by helicopter. He survived the shooting.
(5) Police collected two spent .25 caliber shell casings from the scene; however the weapon was not recovered. Based on the size of the ammunition fired from the gun, police described it as a very small pistol, "probably less than the size of your palm." A firearm of that caliber would produce a flash from the muzzle.
(6) Wescott was not detained at the scene, but turned himself in the next day, after he heard that police were looking for him. He was arrested and indicted on charges of attempted murder in the first degree, possession of a firearm during the commission of a felony ("PFDCF"), and possession of a firearm by a person prohibited ("PFPP").
(7) Wescott moved to sever the PFPP charge due to the potential prejudice of the jury hearing evidence that Wescott was a convicted felon. The Superior Court granted his motion. Wescott went to trial first on the attempted murder and PFDCF charges. The jury acquitted him of both charges, as well as a lesser included offense of assault in the first degree.
(8) Soon after the jury returned its verdict of not guilty, the State announced its intention to proceed to trial on the PFPP charge. The parties stipulated at trial that Wescott was prohibited from "purchasing, owning, possessing, or controlling a deadly weapon within the State of Delaware." The State called various police officers, detectives, and emergency medical technicians who responded to the scene, collected evidence, and took statements from the witnesses and Wescott. Wescott did not testify, but his redacted police interview was played at trial, as were taped telephone conversations from prison. In his police interview, he repeatedly denied having been in a fight with Gibbs; however, the taped phone call supported that he did. Wescott moved for dismissal of the charge on three occasions: (1) when the State announced its intention to proceed to trial, (2) prior to the start of trial, and (3) at the conclusion of the State's case. The trial court denied each motion. The jury returned a verdict of guilty.
(9) At sentencing, the prosecutor requested the statutory maximum sentence because Wescott already was on probation for reckless endangering involving the firing of the same caliber of gun at another person. The Superior Court sentenced Wescott to eight years at Level V, the maximum period of incarceration for the PFPP charge. The Superior Court also sentenced Wescott for a violation of probation, re-imposing all of the remaining Level V time that had previously been suspended. In sentencing Wescott to the maximum penalty, the sentencing judge explained:
I am absolutely convinced that you are a very violent man, and that you are not amenable to any lesser sanctions. As an aggravating factor, it is certainly obvious that you were on probation at the time of this offense and you should not have possessed a firearm or any other deadly weapon.
This appeal followed.
(10) Wescott contends that the Superior Court erred when it denied his motion to dismiss his PFPP charge without analyzing whether the charge was fully litigated at the first trial. He argues that, because the State failed to present any evidence at the second trial other than evidence that indicated Wescott may have shot Gibbs, his second trial was barred by principles of double jeopardy and collateral estoppel. We review claims of violations of constitutional rights de novo.[1]
(11) The Double Jeopardy Clause of the United States Constitution states that no "... person [shall] be subject for the same offense to be twice put in jeopardy of life or limb...."[2] The Delaware Constitution similarly states that "no person shall be for the same offense twice put in jeopardy of life or limb...."[3] Double Jeopardy, as a constitutional principle, provides the following protections: (1) against successive prosecutions; (2) against multiple charges under separate statutes; and (3) against being charged multiple times under the same statute.[4] In this case, only the second principle is involved. In Blockburger v. United States,[5] the United States Supreme Court articulated the same-elements test to determine whether double jeopardy had been offended when a person is charged with violating two statutes as a result of one act. "`[T]he question is whether, both sections being violated by the same act, the accused committed two offenses or only one.' The standard used in Blockburger is `whether each [statutory] provision requires proof of a fact which the other does not.'"[6]
(12) The prohibition against double jeopardy is not implicated in this case, because the elements of each crime differed. In the first trial, to convict Wescott of attempted murder in the first degree or assault in the first degree, the State had to prove that Wescott intended to kill or cause serious physical injury to Gibbs, respectively;[7] and to convict Wescott of PFDCF, the State had to prove that Wescott possessed a firearm during the commission of a felony. Here, that would have been either murder or assault.[8] However, in the second trial, in order to convict Wescott of PFPP, the State only had to prove that Wescott possessed a gun, and was prohibited from doing so.[9] Each crime has at least one element that each of the others does not; therefore, Wescott's second trial for PFPP did not offend principles of double jeopardy.
(13) This Court has explained that "[p]rinciples of double jeopardy, which are limited to the criminal context, are subsumed by the broader doctrine of collateral estoppel, which `means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be litigated between the same parties in any future lawsuit.'"[10] The General Assembly has codified the collateral estoppel doctrine in 11 Del. C. § 208, which specifically addresses the situation where a criminal prosecution is barred by an earlier acquittal for a different offense:
Although a prosecution is for a violation of a different statutory provision or is based on different facts, it is barred by a former prosecution in a court having jurisdiction over the subject matter of the second prosecution under the following circumstances: ... The former prosecution was terminated by an acquittal ... [that] necessarily required a determination inconsistent with a fact which must be established for conviction of the second offense.[11]
Thus, "[t]he test for applying the collateral estoppel doctrine requires that `a question of fact essential to the judgment be litigated and determined by a valid and final judgment.'"[12] In order to apply this test, "we examine the issues that were considered in the earlier prosecution, including the pleadings, defense, evidence, and jury charge."[13]
(14) In Godwin v. State,[14] we held that collateral estoppel did not bar a second prosecution for possession of a deadly weapon by a person prohibited ("PDWPP") when the defendant was previously acquitted of possession of a deadly weapon during the commission of a felony ("PDWDCF") and the underlying felony at an earlier trial. In that case, police executed a search warrant of the defendant's home, where they located the defendant and three other males, drugs, drug paraphernalia, and a knife. An officer testified that the defendant was standing behind the couch where the knife was found and admitted that he owned the knife.[15] A jury acquitted the defendant of maintaining a dwelling and PDWDCF; but at a later bench trial, the defendant was found guilty of PDWPP.[16] We upheld that conviction, explaining that "the jury [at the first trial] could have rationally based its verdict on the ground that [the defendant] did not possess the knife, or that he did not commit the felony, or that he did not possess the knife during the felony. Thus, whether the jury specifically decided the possession issue in [the defendant's] favor is unknown."[17]
(15) Godwin is directly applicable here. At the second trial, to prove Wescott committed the crime of PFPP, the State was required to prove two elements: (1) that Wescott was a person prohibited; and (2) that he possessed a firearm.[18] Wescott's acquittal at the first trial on charges of attempted murder in the first degree, assault in the first degree, and PFDCF, did not affirmatively establish either of these elements. Wescott's acquittal on those charges merely demonstrated that the State did not establish beyond a reasonable doubt that Wescott intended to kill or cause serious physical injury to Gibbs. As the trial court explained, "the jury could conclude that Mr. Wescott certainly did possess a firearm but never intended to kill Mr. Gibbs" and "[s]ince he didn't intend to kill him, he still could have possessed a firearm, but he didn't possess it during the commission of a felony."
(16) Wescott argues that Godwin is distinguishable from this case because, in Godwin, there was other evidence that could support the defendant's conviction, but in this case the only evidence that he possessed a gun was that he possessed it when he shot Gibbs, an act for which he had been acquitted. He asserts that the State presented no evidence that he had a gun before or after the alleged shooting, and that the State's witnesses testified that they knew he had a gun only because they saw a flash of fire, heard shots, or knew of the gunshot wound. While Wescott is correct that the only evidence admitted at trial related to his possession of a gun during a crime for which he was acquitted, this does not distinguish Godwin. Godwin was based not on the availability of other evidence to support the defendant's conviction, but on the assessment that the general jury verdict did not lead to the unavoidable conclusion that the possession of a deadly weapon issue was actually and necessarily decided in the defendant's favor in the prior adjudication.
(17) In this case, the trial court's conclusion that Wescott's acquittal in the first trial did not determine a question of fact essential to the PFPP charge, is supported by the testimony presented at the first trial. The witness testimony regarding the shots fired was conflicting, which could have given the jury reasonable doubt regarding Wescott's intent to kill or seriously injury Gibbs. For example, witness statements varied concerning the number of shots fired and the distance between Wescott and Gibbs when the shots were fired. Purnell, who testified at both the first and second trial, testified that at least one shot was pointed toward the ground, and three shots were fired into the air. Purnell also testified that there were a lot of people involved in the fight, and Wescott was fifty feet away from Gibbs when he pointed the gun "towards [Gibbs's] direction." From this testimony, the jury could have inferred that Wescott possessed a gun, and even fired a gun at the party, but did not have the intent to kill or injure required to convict him of attempted murder in the first degree or assault in the first degree. Thus, as in Godwin, the general jury verdict of not guilty did not necessarily require a determination inconsistent with a fact which must be established for conviction of the second offense. Accordingly, the Superior Court did not err in denying Godwin's motion to dismiss the PFPP charge.
(18) Wescott next contends that the Superior Court abused its discretion and violated his due process rights and guarantees against double jeopardy when it sentenced him to the maximum possible period of incarceration without a sufficient articulation of aggravating factors. He argues that the severity of the sentence, combine with the lack of explanation raises the question of whether the trial judge was acting vindictivelythat he thought Wescott "got away with (attempted) murder after the first trial, and that the guilty verdict on the Person Prohibited charged opened an opportunity to compensate for the acquittal."
(19) In Fink v. State,[19] we explained the standard of review for sentencing decisions, as follows:
This Court reviews sentencing of a defendant in a criminal case under an abuse of discretion standard. Appellate review of a sentence generally ends upon determination that the sentence is within the statutory limits prescribed by the legislature. Thus, in reviewing a sentence within statutory limits, this Court will not find error of law or abuse of discretion unless it is clear from the record that a sentence has been imposed on the basis of demonstrably false information or information lacking a minimal indicia of reliability. In reviewing a sentence within the statutory guidelines, this Court will not find error unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind.
To the extent that Wescott raises claims of violation of his constitutional rights, we review de novo.[20]
(20) "Possession of a deadly weapon by a person prohibited is a class F felony, unless said deadly weapon is a firearm or ammunition for a firearm, in which case it is a class D felony."[21] "The term of incarceration which the court may impose for a felony is fixed as follows: ... [f]or a class D felony up to 8 years to be served at Level V."[22] Therefore, although the sentencing judge imposed the maximum sentence permitted for the offense, the sentence was still within the statutory limits. Accordingly, our review of Wescott's sentence ends at that point unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind.[23]
(21) We find no evidence in the record that the sentencing judge had a closed mind regarding sentencing.[24] Wescott does not appear to argue that he did. Instead, Wescott claims that the sentencing judge relied on impermissible factors in making his sentencing decision. He argues that "[t]he fact that the judge was `convinced' Wescott was a violent person suggests the judge believe Wescott committed the crimes of Attempted Murder and Assault First ... even though Wescott was acquitted of those charges." This argument is without merit for three reasons. First, a mere suggestion, without more, that the sentencing judge believed that Wescott committed the crimes of attempted murder and assault in the first degree is not "clear [evidence] that the sentencing judge relied on impermissible factors." Second, there is nothing in the sentencing judge's explanation indicating that he relied on impermissible factors. Finally, the record shows a basis to conclude that Wescott was a "very violent man" apart from the charges for which he was acquitted. Wescott's criminal history included a conviction for reckless endangering that involved Wescott following home a person who had won money from him, and firing the same caliber handgun as the one he possessed in this case at that person. Wescott missed and the victim's father tackled him to the ground before he could fire again. The Wescott admitted to police that he intended to shoot the victim and merely missed. This alone would be sufficient to convince the judge that Wescott was a "very violent man."
(22) Wescott next argues that the sentencing judge erred by not adequately articulating his reasons for the sentencing decision. He urges this Court to adopt the prophylactic rule established by the United States Supreme Court in North Carolina v. Pearce,[25] which applies to sentencing after retrial, and apply that rule to this set of facts, where the defendant is separately tried on severed charges.
(23) In Pearce, after their convictions had been set aside on appeal, two defendants were reconvicted for the same offenses and sentenced to longer prison terms. In one case, the term was increased from 10 to 25 years. The United States Supreme Court held that, while a trial court is not constitutionally prohibited from imposing a greater sentence after a new sentencing or trial is ordered after remand, "[d]ue process of law ... requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial" and second conviction.[26] In order to assure the absence of such a motivation, the Court adopted a prophylactic rule which requires a trial judge who imposes a more severe sentence upon a defendant after a new trial, to affirmatively state on the record the reasons for doing so.[27] The Court explained that "[t]hose reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal."[28]
(24) We adopted Pearce's prophylactic rule in Jacobs v. State,[29] holding that "it is clear that the Due Process Clause of the Fourteenth Amendment has now been construed to require that where the second sentence upon retrial in a state court is greater than the first `the factual data upon which the increased sentence is based must be made part of the record....'" Because the record in that case contained no reason for an additional five years being added to the appellant's overall sentence, we remanded with instructions to either supplement the record with reasons for the enhanced sentence or identify where in the record the reasons had already been set forth.[30]
(25) Although the rule in Pearce is good law, the United States Supreme Court has declined to expand the rule to factually similar scenarios. For example, in Colten v. Kentucky,[31] the Court held that the requirement was not applicable where the greater sentence was imposed by a different court after a trial de novo in a two-tier trial system. More recently, in Alabama v. Smith,[32] the Court overruled Simpson v. Rice,[33]Pearce's companion case. In Rice, the complained-of sentence followed a trial after the defendant had successfully attacked his previous guilty plea.[34] The Court in Rice, applying the same rule as in Pearce, found that a presumption of vindictiveness arose when the State offered "no evidence attempting to justify the increase in Rice's original sentences...."[35] However, in Smith, the Court rejected the presumption of vindictiveness in that situation, noting the greater amount of sentencing information that a trial affords as opposed to a guilty plea.[36] Thus the Court overruled Rice, confining Pearce to the specific instance where a defendant faced sentencing after successfully attacking his previous conviction after trial.[37] Because the United States Supreme Court has cabined Pearce to the facts of conviction, appeal, reversal, reconviction of the same offense, and a greater sentence, Pearce has no application here.
(26) Wescott next argues that the lack of a detailed explanation differentiating the two trials leaves open the possibility that Wescott was placed in double jeopardy by being penalized for a course of conduct of which he was acquitted. Wescott claims that, while the trial judge's imposition of the maximum sentence in itself may be permissible, if even a part of his rationale for doing so was that the first jury wrongly acquitted him of attempted murder or assault, then his protection against double jeopardy was violated. Wescott has failed to demonstrate how double jeopardy applies to the sentencing decision on the PFPP conviction. The Fifth Amendment guarantee against double jeopardy necessarily involves a subsequent or redundant prosecution.[38] Here, Wescott was sentenced for a separate crime with a specific explanation of the trial judge's reasons for the sentence imposed. Wescott's propensity for violence was evidence by his prior conviction for reckless endangering. The aggravating factor that the offense was committed while on probation was undisputed. Wescott has failed to show clear evidence that the Superior Court sentenced him with a closed mind or based upon impermissible factors.[39] Accordingly, the sentencing judge did not abuse his discretion in sentencing Westcott to the statutory maximum penalty.
NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.
NOTES
[1] Norman v. State, 976 A.2d 843, 857 (Del. June 16, 2009); Weber v. State, 971 A.2d 135, 141 (Del. 2009); Capano v. State, 781 A.2d 556, 607 (Del. 2001).
[2] U.S. CONST. amend. V
[3] DEL. CONST. art. I, § 8
[4] Williams v. State, 796 A.2d 1281, 1285 (Del. 2002).
[5] 284 U.S. 299, 304 (1932).
[6] Williams, 796 A.2d at 1285 n.13 (quoting Blockburger, 284 U.S. at 304).
[7] 11 Del. C. §§ 636(a)(1); 612(a)(1). (See B47-48 (jury instruction on attempted murder in the first degree); B49-50 (jury instruction on assault in the first degree)).
[8] 11 Del. C. 1447A(a). (See B51-52 (jury instruction on PFDCF)).
[9] 11 Del. C. 1448A. "Possession" had a slightly different meaning for purposes of determining guilt for PFDCF and PFPP. See infra note 31 and accompanying text.
[10] 884 A.2d 487, 492 (Del. 2005) (quoting Spencer v. State, 868 A.2d 821, 822 (Del. 2005)); accord Ashe v. Swenson, 397 U.S. 436 (1970); State v. Hardin, 1994 WL 476136, at *4 (Del. Super. Ct. July 6, 1994).
[11] 11 Del. C. § 208(2).
[12] Banther, 884 A.2d at 492 (quoting Taylor v. State, 402 A.2d 373, 375 (Del. 1979)).
[13] Id. (citing State v., Sheeran, 441 A.2d 235 (Del. Super. Ct. 1981) aff'd on other grounds, 526 A.2d 886 (Del. 1987)).
[14] 2006 WL 1805876 (Del. June 29, 2006). Although Godwin was abrogated by our recent decision in Lecates v. State, 2009 WL 1759722 (Del. June 23, 2009), Godwin is still good law regarding its collateral estoppel analysis.

In Lecates, we explained that, unlike the statute defining PDWDCF (Section 1447A), the statute defining PDWPP (Section 1448) contains no requirement of temporal possession. Section 1447A prohibits weapon possession during the felony. In contrast, Section 1448 makes it a crime for a prohibited person to possess a weapon at any time. Thus, unlike PDWCF, a jury need not find that a weapon was "physically available and accessible to the defendant" in order to convict a defendant of PDWPP.
Indeed, to the extent Godwin's precedential value is affected by Lecates, it militates against Wescott, as the difference between "possession" for purposes of PFDCF and "possession" for purposes of PFPP articulated in Lecates, may render the collateral estoppel analysis performed in Godwin, and by extension this case, moot.
[15] Godwin, 2006 WL 1805876, at *1.
[16] Id.
[17] Id. at *4.
[18] 11 Del. C. § 1448.
[19] 817 A.2d 781, 790 (Del. 2002)
[20] Norman v. State, 976 A.2d at 857; Weber v. State, 971 A.2d at 141; Capano v. State, 781 A.2d at 607.
[21] 11 Del. C. § 1448(c).
[22] 11 Del. C. § 4205(4).
[23] Ward v. State, 567 A.2d 1296, 1297 (Del. 1989).
[24] The sentencing judge ordered a presentence investigation and addressed the parties after Wescott's jury was dismissed seeking any additional evidence the parties planned to introduce at sentencing, including the facts surrounding the conviction by which Wescott became a "person prohibited." This demonstrates the court's desire to hear additional information from both the State and Wescott.
[25] 395 U.S. 711 (1969).
[26] Id. at 725.
[27] Id. at 726; accord Jacobs v. State, 358 A.2d 725, 729 (Del. 1976).
[28] Id.; accord Jacobs, 384 A.2d at 729.
[29] 358 A.2d at 730 (quoting Pearce, 395 U.S. at 726).
[30] Id.
[31] 407 U.S. 104, 116-19 (Del. 1972).
[32] 490 U.S. 794, 802 (1989).
[33] 395 U.S. 711 (1969).
[34] Id. at 714.
[35] Id. at 726.
[36] Smith, 490 U.S. at 803.
[37] Id.
[38] See Williams, 796 A.2d at 1285 (detailing the guarantee provided by double jeopardy as "protections: (1) against successive prosecutions; (2) against multiple charges under separate statutes; and (3) against being charged multiple times under the same statute.") (emphasis added).
[39] Because there is no evidence that the trial judge even considered conduct for which Wescott has been acquitted, we need not address the application of United States v. Watts, 519 U.S. 148 (1997) (holding that sentencing court may consider conduct for which defendant has been acquitted, so long as that conduct has been proved by a preponderance of the evidence).